(Opinion published 57 N. W. Rep. 324.)

### STATE OF MINNESOTA vs. ANNIE M. SMITH.

Argued Dec. 5, 1893. Affirmed Jan. 2, 1894.

No. 8578.

**Impaneling jury. Interrogating juror before challenge.**

The rule laid down in *State* v. *Lautenschlager*, 22 Minn. 514, that whether a trial court will allow questions preliminary to a challenge to be put to a person called to sit as a juror in a criminal case, as to his qualifications, is purely a matter of discretion, adhered to and applied in a case where nothing further appeared in the record than that the defendant had exhausted all of her peremptory challenges when her counsel attempted to ask such questions.

**Rulings upon offers of evidence.**

Rulings of the trial court as to the admissibility of certain evidence offered in behalf of the prosecution discussed and disposed of.

**Evidence examined and held to show murder and not manslaughter.**

*Held*, that there was no evidence introduced in the trial of this case—which resulted in a verdict of murder in the third degree—reasonably tending to reduce the crime of murder, in one of its three degrees, to manslaughter in either of the degrees defined in the Penal Code, and hence that the trial court did not err when declining to charge the jury as to the different degrees of manslaughter.

Appeal by defendant, Annie M. Smith, from an order of the District Court of Ramsey County, *Hascal R. Brill*, J., made July 3, 1893, denying her motion to set aside the verdict, judgment and sentence, and grant her a new trial.

On the morning of July 4, 1892, Edward Hoppe went from St. Paul with two other men by wagon to Big Bass Lake, fishing. They took with them a bottle of whiskey and a case of pint bottles of beer from

which they drank more or less on the way. The lake is six miles north of the business part of St. Paul, and is about two miles long and half a mile wide. On the south shore within a hundred feet of the water was a house in which the defendant, Annie M. Smith, and Charles Hennig resided. Hoppe separated from his companions and went some distance along the shore to the vicinity of this house and there waded into the shallow water to fish. Hennig ordered him away, threw stones at him and went into the water where he was and struck him with an oar. Mrs. Smith then came out to assist Hennig. She soon after ran back into the house and got a revolver and returning shot three times. The last shot killed Hoppe. She and Hennig were on October 10, 1892, indicted for murder. She demanded a separate trial. A jury was empannelled December 7, 1892, and having heard the evidence, returned a verdict finding her guilty of murder in the third degree. She was sentenced December 21, 1892, to be confined at hard labor in the State's Prison at Stillwater for the period of twenty-five years. She moved for a new trial, but was denied and she appeals.

*W. W. Erwin,* for appellant.

The court erred in refusing to permit the defendant to ask preliminary questions of the several persons called as jurors to determine if there was cause for challenging such persons, before challenging for any cause, and in permitting the state's attorney to admit the challenges of the defendant without evidence, when such challenges had been made by the defendant. It was held in the case of *State* v. *Lautenschlager,* 22 Minn. 514, that it was within the discretion of the Court to refuse to allow questions before challenge. The denial of the right to ask preliminary questions before challenge was productive of such injustice and oppression to the defendant as to amount to an abuse of discretion. This question was not considered in the *Lautenschlager* case. That case is further to be distinguished from this, by the fact, that it does not appear in that case that the defendant's peremptory challenges were exhausted. In this case, a juror was called up. He was entirely unknown to the defendant. Counsel for defendant asked permission to put a few preliminary questions before challenge. This was refused. Defendant then asked several questions of the juror without challenge, and objec-

tions to them were sustained.    The defendant had then no alternative but to accept the juror without question or interpose a challenge. Not wishing to accept the juror without an opportunity to learn if he had prejudged the case, the defendant was compelled to challenge, and before a single question was asked the challenge was admitted by the state's attorney, the defendant's request to withdraw the challenge was denied, and the juror ordered to stand aside.

Four witnesses to the homicide, having testified to all the circumstances of the conflict down to the death of Edward Hoppe, were permitted to testify against the objection of the defendant, that after the defendant had left the scene, Hennig dragged the body of Hoppe along the lake shore some little distance off of his premises.    This act of Hennig, not being in her presence or in pursuance of any common design, was not competent evidence against her for any purpose.    It stands in the same position as declarations made by a codefendant under the same circumstances.    *People* v. *Moore*, 45 Cal. 19; *Commonwealth* v. *Eberle*, 3 Serg. & R. 9; *State* v. *Pike*, 51 N. H. 105; *Hamilton* v. *People*, 29 Mich. 173; *People* v. *Parker*, 67 Mich. 222; *Meyers* v. *State*, 8 Tex. App. 321.

Courts will rarely presume that evidence wrongfully admitted could have had no effect on the deliberations of the jury.    *McKnight* v. *State*, 6 Tex. App. 158; *Sommerville* v. *State*, 6 Tex. App. 433; *Starin* v. *People*, 45 N. Y. 333; *Hoberg* v. *State*, 3 Minn. 262; *State* v. *Hoyt*, 13 Minn. 132.

The Court erred in allowing the signs against trespassers found on the premises to be introduced against the defendant without any evidence tending to connect her with the same, and in refusing to allow the defendant to explain such signs upon the cross-examination of the officer producing them by showing the character of the community.

The Court erred in its charge to the jury in failing to instruct the jury as to manslaughter in the first and second degrees, and in instructing the jury that if they found the defendant guilty they must convict her of murder in the first, second or third degree.    *McLaughlin* v. *State*, 10 Tex. App. 340; *Johnson* v. *State*, 43 Tex. 576; *State* v. *Clemons*, 51 Ia. 274; *State* v. *Walters*, 45 Ia. 389; *State* v. *Vinsant*, 49 Ia. 241; *State* v. *Kegan*, 62 Ia. 106; *State* v. *Peters*, 56 Ia.

263; *State* v. *Pennell*, 56 Ia. 29; *State* v. *Glynden*, 51 Ia. 463; *State* v. *Kirkland*, 14 Rich. 230.

There was provocation sufficient to arouse that hot blood and heat of passion which is essential to manslaughter. *State* v. *Hoyt*, 13 Minn. 132; *Stewart* v. *State*, 78 Ala. 436; *McCoy* v. *State*, 8 Ark. 451; *People* v. *Turley*, 50 Cal. 469; *Golden* v. *State*, 25 Ga. 527; *State* v. *Fitzsimmons*, 63 Ia. 656; *Commonwealth* v. *Drum*, 58 Pa. St. 9; *State* v. *Levigne*, 17 Nev. 435; *State* v. *Crane*, 95 N. C. 619.

The question whether the defendant did not act honestly under fear produced by an insufficient cause should have been left to the jury, and that if the jury found such to be the case they could have convicted of manslaughter in the second degree. *State* v. *Cody*, 18 Or. 506; *Lang* v. *State*, 16 Lea 433; *State* v. *Banks*, 73 Mo. 592; *People* v. *Murray*, 72 Mich. 10; *Sanders* v. *State*, 41 Tex. 306.

Very many cases may be found which decide that the failure to give special instructions applicable to minor points of evidence is not error in the absence of a request, and these will doubtless be cited for the respondent, but I think no case can be found, holding that a request is necessary where the charge of the Court fails to submit to the jury the issues raised by the traverse of the indictment. *State* v. *Pennell*, 56 Ia. 29; *Conners* v. *State*, 47 Wis. 523.

*H. W. Childs*, Attorney General, *George B. Edgerton*, his assistant, and *Pierce Butler*, County Attorney, for the State.

The objection to the course pursued in empannelling the jury is based upon a false implication of knowledge of the jury by the prosecuting attorney, which the defendant's attorney has not. As a matter of fact, both sides stand upon the same plane with the same information concerning the jury. If the defendant is satisfied with the juror, she does not challenge, and the State must challenge and examine him, and is subject to the same danger of an allowance of the challenge by the defendant. The burden of defendant's complaint is that she is required to challenge first. This Court has passed squarely upon the question in *State* v. *Lautenschlager*, 22 Minn. 514; *State* v. *Kluseman*, 53 Minn. 541.

There can be no question that the State had a right to trace the body from the time of death until after the coroner's inquest. It was

part of their case to establish and identify the body, to connect the person shot with the body found. The defendant could not, by admitting its identity, deprive the State of this right.

The Court did not err in allowing the signs against trespassers found on the premises to be introduced against defendant, without any evidence tending to connect her with the same, and in refusing to allow the defendant to explain such signs upon the cross-examination of the officer producing them by showing the character of the community. The defendant, Annie M. Smith, was not in the service of Hennig. She lived there with him. The land upon which the building stood was hers. These signs were upon that land set up conspicuously and were in the nature of public threats against trespassers.

Under the evidence in this case the defendant was either guilty of murder, or the shooting was done in self defense, and she should have been acquitted. The crime having been committed with a deadly weapon, the provocation must have been great indeed to lower the crime from murder. Though she may not have intended to hit the deceased, the act evinced a depraved mind, regardless of human life. It was eminently dangerous. The circumstances under her own testimony justified a verdict of murder in the third degree.

COLLINS, J. The defendant, indicted for the crime of murder in the first degree, was convicted of murder in the third degree, which, according to the Penal Code, is the inexcusable or unjustifiable killing of a human being, perpetrated by an act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual, or, without a design to effect death, by a person engaged in the commission of, or in an attempt to commit, a felony, either upon or affecting the person killed, or otherwise. From an order denying a motion for a new trial, she appealed. Her counsel has very properly arranged his assignments of error into four distinct groups and has so argued them. They will be considered in the same manner.

The first four relate to the rulings of the trial court whereby defendant's counsel was refused permission to put preliminary ques-

tions to several of the persons called while the jury was being im-
paneled, as to their qualifications, without first interposing a chal-
lenge, and in allowing the prosecuting attorney to promptly admit
these challenges; and also in not permitting the defendant to
withdraw challenges when made under these circumstances, and
after they stood admitted by the state. Undoubtedly, the court
below, when making these rulings, acted on the authority of *State*
v. *Lautenschlager*, 22 Minn. 514, in which it was held that this mat-
ter of allowing preliminary interrogatories to be put to a person
brought to the jury box, as to his qualifications to serve as a juror,
is purely discretionary with the court, and that whenever a chal-
lenge is interposed by either party, and admitted by the other,
there is nothing to try, and the person challenged must stand aside.
But it is contended by counsel that under all the circumstances
of the present case, and in connection with other rulings of the
court while the jury was being selected, the rulings in question
were so unjust and oppressive as to amount to an abuse of discre-
tion. We are not advised as to what other rulings counsel thus
refers to, but it is impossible to distinguish the circumstances re-
lating to this point in the case from those attending the Lauten-
schlager Case, except that it did not appear there, as it does from
the record here, that counsel's request to ask questions without
first challenging was made, in two instances, after he had exhausted
all of the peremptory challenges allowed to defendant by statute.
We are fully satisfied that the rule above stated, laid down by this
court in 1876, and which has since prevailed without legislative
change or modification, is practical, sound, and just, and that it
should not be departed from at this time for the reason, solely,
that at the time it was adhered to and followed in the trial court
the defendant had exhausted all of her peremptory challenges.
There is nothing whatever in the record to indicate that the defend-
ant was prejudiced by these rulings, or that the two jurors selected
after she had used all of her peremptory challenges were not wholly
impartial. She had no right to select any particular persons as
jurors to try her case, and, nothing appearing to the contrary, it is
to be presumed that these jurors were impartial. *State* v. *Kluseman*,.
53 Minn. 541, (55 N. W. 741.)

The fifth assignment of error relates to testimony received as

to what Hennig, a codefendant, did with the body of the deceased after this defendant left the scene of the homicide. It was shown on the trial that the title to the premises, a small tract of land bordering on a lake, was in Mrs. Smith, and that Hennig and herself resided in a house built there by the former. Both were present when Hoppe, the deceased, was shot. The body fell into shallow water, and Mrs. Smith then ran to the house, a short distance, and from there went to the office of a justice of the peace. Soon after she left the shore of the lake Hennig went into the water, and dragged the body a few rods, to a point opposite the premises of another person; and proof of these facts was objected to by defendant's counsel. We need not discuss the contention of counsel for the state that, for several reasons which they present, this testimony was relevant and competent. Its admission could not have prejudiced the defendant under any view of the case. Again,—and this indicates what her counsel really thought of it at the time,—Hennig was called as a witness for the defense, and, in response to inquiries made on the direct examination, fully detailed the circumstances, and all he did with the body after Mrs. Smith absented herself.

By the sixth and seventh assignments it is urged that the trial court erred when permitting the state to put certain signs or notices to trespassers in evidence, without any testimony tending to connect the defendant with them, and also erred when refusing to allow the character of the community to be shown in explanation, by a cross-examination of the officer who removed these signs or notices from the land, and produced them in court. In respect to these signs or notices, which indicated great hostility towards trespassers, it is enough to say that for months prior to the homicide they had been stuck or nailed up on premises owned and occupied by defendant, and the presumption was that she knew all about them. That she did know about them, and had caused the most threatening of the number to be painted and put up, was afterwards shown by her own testimony, without objection. If there was a valid objection to the introduction of these signs and notices in evidence it was not that suggested by counsel. The testimony sought to be elicited from the officer, as to the character of the community in which these signs and notices were put up, was clearly inad-

missible, because he had not been examined on any subject which would warrant any such cross-examination.

We now come to a consideration of the last group of assignments of error. It is argued with great force and ability, by the distinguished counsel for the defendant, that the court committed serious error when failing to instruct the jury as to the different degrees of manslaughter. No request to so instruct was made, but upon the conclusion of the charge an exception was entered upon the ground and because the court had omitted any instruction in respect to the several degrees of the crime of manslaughter. No complaint is made that the law in relation to the crime of murder in its different degrees was not fairly and completely covered, or that the court, in its charge, was otherwise derelict.

Under an indictment for murder, a conviction may be had for any of the lesser degrees of the crime, and, without expressly so determining, we assume that an exception like that entered in the case at bar is sufficient to call the attention of the trial court to the alleged error and omission in its' charge, if such error and omission there be.

So, if, upon the trial of this case, there was evidence introduced which reasonably tended to reduce the offense for which defendant was being tried, from murder in the first or second or third degree to manslaughter in either of its degrees, the court should have charged the jury in respect to the crime last mentioned and its degrees, as defined by the Code, and in neglecting so to do committed an error for which a new trial should be granted. If, upon the other hand, there was an absence of evidence of this character, and there was no testimony tending to show the commission of any other crime than murder in one of its defined degrees, it was not error for the court to withhold instructions bearing upon the lesser crime of manslaughter. These views compel us to examine the evidence in the most favorable light for defendant, Smith. We have stated that she and her codefendant, Hennig, lived together upon a tract of land owned by herself, and bordering upon a lake. They had resided on these premises for many years, and had often been annoyed by trespassers, especially by people who came there from the city to fish. On the morning of the homicide, Hoppe, somewhat under the influence of liquor, waded in the water of the lake a short

distance from the shore, and in front of defendant's land. He had a cane fish pole, and was fishing. He there got into an altercation with Hennig, who stood upon the shore. Mrs. Smith was at the house, a few rods distant, and hearing loud words, and seeing Hoppe, who was the larger and stronger man, assaulting Hennig, she ràn to the assistance of the latter, having a trowel in her hand. Taking her own testimony as to what followed, and construing it most advantageously for her, it appears that, when she came to the men, Hoppe had Hennig by the throat, and had struck him in the face. The latter had stumbled or partially fallen. Mrs. Smith stepped between them, and struck Hoppe upon his hand with the trowel, gave him a push, and he fell into the shallow water. She then "flew," as she expressed it, to the house for her revolver, and immediately came back with it. Hoppe was scrambling up out of the water, while Hennig was washing a bleeding hand. All three stood within a few feet of each other, and she shouted to Hoppe, "Don't you strike him again," and to Hennig, "Are you hurt?" The latter made no reply, whereupon she said to Hoppe, "You've killed him! you've killed him! Now I'll have to bear the blame: You'll run away, and I'll have to bear the blame." There was nothing in the situation at this time, so far as was shown by the testimony, to cause any of these remarks, for apparently Hennig was not injured to any extent, and Hoppe had manifested no disposition to again assault him or to run away. Hoppe then, in broken English, applied some opprobrious epithets to the woman, and threatened, as she understood him, "to make the lake red with her blood." She retorted, "If you do, you'll get hurt." He also punched her in the breast with the fish pole, and "it kind of hurt me little." He also threw a small beer bottle at her, which, after hitting her sunbonnet, smashed to pieces against the barn door. The first shot was fired by Mrs. Smith immediately after the bottle was thrown, and at the time she said, "Now, you throw again, and I'll settle it with you." When the fish pole was used, she said, "Are you fixing to shoot, eh? Don't try that game. Maybe somebody else can shoot, too." Hoppe replied, when using the pole, "I shoot you with that." It appears from Mrs. Smith's testimony that after the first shot she started off, that Hoppe pursued,—evidently for a few steps only, —and that she fired the revolver a second time; and it also ap-

pears that, up to this second firing, Hoppe had constantly used foul epithets and threatening language. She then returned to the lake, and "it didn't seem he wanted to trouble me, and we stood there a while,"—just how long was not stated. It is obvious, however, that very few moments expired before hostilities were resumed, and Hoppe, putting his hand in his pocket, and drawing out something which looked bright, said, "You nigger bitch, you all ought to be dead. I'll blow your brains out;" and then, said the defendant witness, "I fired. I was too quick for him." Hoppe fell dead in the water. Mrs. Smith further testified that she did not design to shoot Hoppe, but intended to fire over his shoulder, that she might frighten him from the premises, and at the same time, by means of the shots, attract the attention of other persons in the vicinity to his bad conduct, several being within sight and hearing. Although it took her some time, when on the witness stand, to detail the circumstances, it is evident that very few minutes elapsed from the time she first came to the lake until the fatal shot was fired.

Was there anything in this evidence which tended to reduce the offense from murder to manslaughter, or which would have justified the jury in finding defendant guilty of a crime lower in degree than that stated in their verdict? By its refusal to charge as to the two degrees of manslaughter, the trial court declared there was not, and we fully agree in its determination. By Penal Code, § 159, it is provided that a homicide, not being justifiable or excusable, nor murder in either of the degrees previously defined, is manslaughter. Such homicide (section 160) is manslaughter in the first degree when committed without a design to effect death, either (1) by a person engaged in committing, or attempting to commit, a misdemeanor affecting the person or property, either of the person killed, or of another; or (2) in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon. Such a homicide is manslaughter in the second degree, when committed without a design to effect death in either of three ways distinctly specified in section 164; the third being: "By any act, procurement, or culpable negligence of any person, which, according to the provisions of this chapter, does not constitute the crime of murder in the first or second degree, nor manslaughter in the first degree." The defendant's counsel, in his brief, designates

this as the "omnibus clause," and admits that manslaughter in the second degree, as applicable to the case at bar, is only defined in the above excerpt from section 164.

When going upon defendant's land, Hoppe was a trespasser, undoubtedly, and it appears from the testimony before mentioned that at some time during the conflict of words he punched defendant with the fish pole, and also threw a bottle at her, which missed her person, and struck a barn door. After firing the first shot, she started away, and, upon seeing that she was followed, again fired, and then returned to the lake. Up to this time, it is obvious, from what had been said and done, that she was not afraid of Hoppe, and had no reason to be. In the war of words she manifested no fear, and without the slightest trouble she had pushed Hoppe over into the water, and his condition was such that she had time to run to the house, get her revolver, and return, before he had regained his feet. Up to the time she fired the second shot, and returned to the lake shore, Hoppe had committed no serious wrong; had done nothing which warranted the use of a deadly weapon upon him. The provocation given by trespassing on defendant's land was not such as would provoke any person not wholly regardless of human life to use a deadly weapon; nor is it such as the law will recognize as sufficient to reduce the killing to a lower crime than murder. *State* v. *Shippey*, 10 Minn. 223, (Gil. 178.) Nor would the use of the fish pole in the manner testified to justify the use of a deadly weapon. Undoubtedly, she scarcely felt the blow. Nor would the throwing of the bottle warrant the killing in question, for it simply hit her bonnet. It did not even put her in fear, if we can rely upon what she said to Hoppe immediately afterwards. There can be no doubt that, when she fired the second shot, a design to kill would have been unjustifiable and inexcusable. To determine of the sufficiency of the provocation to mitigate the killing from murder to manslaughter, the instrument or weapon with which the homicide is effected must be taken into consideration, for, if it was effected with a deadly weapon, the provocation must be great, indeed, to lower the grade of the crime from murder; if with a weapon or other means not likely or intended to produce death, a less degree of provocation will be sufficient. In fact, "the instrument employed

must bear a reasonable proportion to the provocation to reduce the offense to manslaughter." *State* v. *Shippey, supra,* and authorities cited.

Now, let us see what transpired when Mrs. Smith returned to the lake shore after firing the second shot. Hoppe was standing in the water. The parties stood there awhile, and defendant testified that it seemed as if Hoppe did not want to trouble her again. He then repeated his epithets and abusive language, threatened to kill her, and drew something from his pocket which looked bright. She fired; "was too quick for him." This evidence shows that after there had been threats and acts of hostility upon Hoppe's part, and after Mrs. Smith had twice discharged the revolver, both parties were quiet and apparently at peace. Then Hoppe resumed his abusive language, accompanying it with an act which indicated to Mrs. Smith, as she claims, that he was about to shoot her, although in fact he was unarmed, and, without delay, she shot him down. If her story be true, she fired in self-defense, and not otherwise. She so insisted upon the trial, although claiming at the same time that she did not intend to hit him, but merely to frighten. In either case, it is manifest from her own version of the affray that she did not fire in the heat of passion, nor was Hoppe killed by means of an act not constituting the crime of murder in the first or second degree, nor manslaughter in the first degree. The killing, not being excusable or justifiable,—and the jury found that it was not,—was murder in one of the degrees defined in Penal Code, §§ 152, 153, and 155. As the law respecting the different degrees of manslaughter was inapplicable to the facts of the case, the court below was not required to incorporate the same in its charge to the jury. *State* v. *Staley,* 14 Minn. 105, (Gil. 75.)

Order affirmed.

(Opinion published 57 N. W. Rep. 325.)